Vinnie S. Salter, Administratrix of the Estate of Richard H. Salter, Deceased, Appellee, v. Mary A. Condon, Executrix of the last will and testament of John Condon, Deceased, Appellant.

Gen. No. 28,885.

1. PARTNERSHIP—*extent of member's right to dissolve firm.* One member of a partnership at will may dissolve it at any time, reasonable or unreasonable, and in the exercise of either good or bad faith.

2. FRAUD AND DECEIT—*burden of proof of fraud.* If the motives and designs of parties charged with fraud may be traced to an honest and legitimate source equally as well as to a corrupt one the former explanation should be preferred, the burden of proving fraud by clear and satisfactory evidence resting on the party alleging it.

3. PARTNERSHIP—*when agreement constituted a general partnership.* An agreement whereby defendant, the owner of land and buildings, contributed the use of such premises for the purposes of a golf course and clubhouse and also contributed a sum of money to fit the premises for that purpose and complainant expended the money in fitting up the premises and conducted the business of running the golf course and clubhouse, the two to share equally the profits or losses of the business, constituted a general partnership, not a partnership in profits alone, and upon dissolution complainant was entitled to a share in the good will of the business, if any existed.

4. PARTNERSHIP—*firm good will as asset to be accounted for on dissolution.* The right of one member of a partnership to an accounting for an alleged good will of the business upon its dissolution by the other partner is to be determined by whether there is a good will which would have a fair marketable value if the good will was to be disposed of at a judicial sale.

5. PARTNERSHIP—*value of firm good will as asset on dissolution.* Where the owner of land contributed its use to a partnership between himself and complainant for the conducting of a public golf course, by an agreement which did not obligate him to sell or lease the premises for a continuation of the business, the good will of the business was valueless upon dissolution of the partnership by him.

6. PARTNERSHIP—*valuation of firm good will on dissolution of*

*partnership.* Assuming that the good will of a golf course business had a salable character though, under the partnership agreement, defendant could not be compelled to sell or lease the grounds to the purchaser, the court did not adopt the correct method of determining its value by adopting, arbitrarily, the number 3 as a factor and multiplying the average net yearly income from the business thereby, where there was no evidence that the profits were such as might fairly have been expected; no evidence on which a comparison of profits could be made with other golf clubs similarly situated; no evidence as to whether the business was efficiently conducted; none as to whether the patronage reached fair and reasonable expectations; and none as to whether the name of the club had acquired a reputation among golf players or become identified with the business of golf conducted by the partnership or that the locality of the club was convenient and accessible.

7. INTEREST—*requisites of allowance for delay in accounting.* To justify the allowance of interest on the amount found due to complainant in a suit for an accounting, the delay of payment must be both unreasonable and vexatious.

Appeal by defendant from the Circuit Court of Cook county; the Hon. GEORGE FRED RUSH, Judge, presiding. Heard in the first division of this court for the first district at the October term, 1923. Affirmed in part; reversed in part, and remanded with directions. Opinion filed January 26, 1925.

MAYER, MEYER, AUSTRIAN & PLATT, for appellant; ABRAHAM MEYER, of counsel.

CHARLES H. WELLS and WALTER S. HOLDEN, for appellee.

MR. JUSTICE JOHNSTON delivered the opinion of the court.

This is an appeal by Mary A. Condon, executrix of the last will and testament of John Condon, deceased, from a decree of the circuit court of Cook county, in a suit for an accounting brought by Vinnie S. Salter, administratrix of the estate of Richard H. Salter, deceased.

The bill of complaint alleges in substance that Richard H. Salter and John Condon entered into a general

copartnership for the purpose of conducting the game of golf as a business enterprise at Harlem, Illinois; that Condon agreed to contribute as his portion of the capital of the copartnership the use of certain lands known as parcel No. 1 and parcel No. 2; that Condon also contributed as his portion of the capital $1,000 to be expended under the direction of Salter in preparing parcel No. 1 for use as a golf course; that Salter agreed to furnish as his portion of the capital of the copartnership his knowledge of golf and of the preparation and maintenance of golf courses, and his services in personally conducting the business of the copartnership; that it was expressly agreed that the profits and losses of the business should be shared equally; that no time was agreed upon for the termination of the copartnership; that part of the lands designated as parcel No. 1 had in previous years been used by Condon as a public race track; that the copartnership was conducted under the name of the Harlem Golf Club; that the copartnership was entered into on September 30, 1909, and continued until about November 30, 1914; that on the latter date the copartnership "was dissolved by the fraudulent acts and doings of said John Condon"; that through the efforts of Salter the business steadily increased each year; that the number of patrons increased to such an extent that Salter repeatedly urged Condon to permit him to put parcel No. 2 in condition for a golf course; that on November 23, 1914, Condon, "without the consent" of Salter "and with the intention to appropriate to his own use the good will" of the copartnership, "and to defraud" Salter of "his rights therein, took possession of" parcel No. 2 and "caused the same to be made into a golf course"; that "in further pursuance of said unlawful and fraudulent design, the said John Condon did also, about November 30, 1914, notify" Salter that "he had elected to terminate the copartnership contract, and that the

grounds on which the partnership business had been conducted were closed; that the said John Condon, on or about said date, took possession of and appropriated to his own use all of the copartnership property, and although" Salter "demanded of him that he make an accounting for the same, the said John Condon refused so to do"; that Salter "with full knowledge and authority of said John Condon, seeded, fertilized and rolled the said parcel No. 1, and for that purpose expended large sums of money out of the copartnership funds, and this expenditure has greatly enhanced the value of said parcel of real estate as a golf course; that the said John Condon has taken possession of the same with the intention to appropriate all the increased value of said land as a golf course and the funds of" Salter, "which contributed to that value," "and for the purpose of depriving" Salter "of his rightful interest therein"; that Salter built up a very large patronage, and that the patrons of the copartnership business will continue as patrons of Condon's golf business; that "the continued patronage of said patrons of said copartnership constitutes a large part of the good will thereof, and is very valuable and is reasonably worth in excess of the sum of $60,000, and with the intention of depriving" Salter "of his share thereof, the said John Condon has taken possession of the said grounds and the improvements made thereon by the expenditure of partnership funds, and has taken and appropriated to his own use and purposes the said copartnership business, the good will thereof and the name under which it was conducted, and is now conducting the business of said copartnership of carrying on a golf course for hire upon the said described premises"; that "the improvements placed upon the said parcel No. 1 by said copartnership funds in the way of sowing grass seed thereon, putting on fertilizer and water pipes, and in constructing putting greens, fair greens, and in caring for the same, have increased the value of said

premises for use as a golf course for hire in a sum in excess of $5,000, and this enhanced value is a part of the property of said copartnership which has been wrongfully appropriated by" said John Condon; that the name, Harlem Golf Club, under which the business of the copartnership was conducted, is of great value; that Condon has inserted a notice in the newspapers of the City of Chicago that the Harlem Golf Club is now open for play with the intention of procuring the patronage of the business of the copartnership; that Condon has taken possession of chattels of the copartnership of the value of $500, and has appropriated them to his own use; that since Condon has appropriated the property of the copartnership Salter has repeatedly requested Condon to make a final settlement of accounts, but that Condon has refused to do so; that upon a just settlement of the accounts there will be a large balance due to Salter.

The specific prayer of the bill is as follows: That Condon "fully set forth a true and just account of all of his actings and doings in respect of said copartnership business since he served notice of his election to dissolve the same, as hereinbefore set forth; and that an account may be taken under the direction of this honorable court of all and every of the said copartnership dealings and transactions, and that the same may be fairly adjusted, and the respective rights of this complainant and the defendant be ascertained; and that the defendant may be decreed to pay to your orator what, if anything, shall appear upon such account to be due from him; and this complainant is ready and willing and hereby offers to pay to the defendant what, if anything, shall appear to be due to the defendant from this complainant."

The answer of Condon admits that he entered into a written agreement on September 30, 1909, with Salter to conduct the business of golf; admits that he contributed $1,000 and the use of the land known as

parcel No. 1, which had formerly been used as a public race track; denies that parcel No. 2 was included in the agreement; admits that on November 30, 1914, Condon notified Salter that the contract was terminated and took possession of the grounds used as a golf course under the contract; denies that Condon terminated the agreement with the intent to appropriate to his own use the good will of the business and to defraud Salter; denies that any good will attached to the business of the partnership, and avers that the business was not conducted in any different manner from that of other golf courses; denies that any improvements were made which increased the value of the golf grounds; denies that Salter has any interest in the grounds or any interest in the name Harlem Golf Club; denies that Condon refused to make a settlement with Salter and avers that Salter had custody and charge of the books of account of the golf course, the receipts and disbursements, and was fully cognizant of all sums received and disbursed; avers that Salter from time to time made payments to Condon of what purported to be Condon's one-half share of the profits, but that Condon does not know whether such amounts were correct; denies that Salter has any right or interest in any of the lands described as parcel No. 1 and parcel No. 2; denies that Salter is entitled to any relief whatsoever.

The cause was referred to a master to take proofs and to report his conclusions, and the master found in favor of the complainant. While the cause was pending before the master both Salter and Condon died, and their widows were made parties to the suit. On the hearing before the court, the court found in favor of the complainant, and entered a decree for the complainant in the sum of $6,902.55.

The evidence for the complainant consists principally of the oral testimony of two witnesses, the written agreement of September 30, 1909, the notice of

the termination of the agreement, the books of account, and letters from Salter to Condon. The oral testimony of the two witnesses related, in substance, to a description of the golf course and the work that was done in constructing the golf course.

The defendant offered no evidence except a letter from Salter to Condon.

The principal issue in the case relates to the question of good will. This question, which is always a difficult one because of the intangible, indefinite nature of good will, becomes more difficult in the case at bar on account of the peculiar facts in the case.

Both counsel for the complainant and counsel for the defendant have thoroughly argued the question, and have made an extended research of the authorities.

The theory of the suit of the complainant, as stated by counsel for the complainant, is as follows:

"This suit is not, as alleged by" counsel for the defendant, "primarily 'based upon a contract' in the sense in which that phrase is commonly used, but is based upon the violation by one partner of his duty not only to refrain from converting partnership assets to his own use upon the dissolution of the partnership, but to account to his former partner for all of the partnership property converted by him to his own use and advantage. The contract referred to was evidence of the partnership agreement, but the duty of each partner to account to the other for all partnership assets in his possession is imposed by the rules of justice and equity, and not by the terms of the contract." Counsel for the complainant further state that "this is not a suit for damages," and that "no claim is made by the complainant for damages resulting from the act of Condon's dissolving the partnership."

In the bill of complaint it is alleged that the contract of the partnership was dissolved by the fraudu-

lent acts of Condon; that Condon fraudulently terminated the contract with the intent to appropriate the good will, and to defraud Salter of his rights in the good will. In their brief counsel for the complainant state that "this cancellation of the partnership agreement was possible within" Condon's "legal rights," although "there is respectable authority to the contrary," and "it is questionable whether Condon was within his legal rights in canceling the partnership without notice."

Counsel for the complainant speak of the cancellation of the contract by Condon as a "despicable transaction," and as "a highly dishonorable and contemptible trick."

Counsel for the complainant further maintain that Condon "wrongfully and illegally appropriated to himself the entire assets of the former partnership, consisting of the personal property, the name Harlem Golf Club and the good will thereof, and has gone on using these properties for his own selfish ends and has refused to account for the same."

It is not contended by counsel for the complainant that the complainant has an exclusive right to the name Harlem Golf Club, or that the defendant has no right to use the name. The complainant does not seek to enjoin the defendant from using the name; nor is the complainant suing to recover damages for the alleged wrongful appropriation of the name. The complainant is suing for an accounting between Salter and Condon. The contention of counsel for the complainant in regard to the name is that the name is one of the principal elements of the good will of the partnership; that Condon has appropriated the name of the partnership, and that on an accounting between Salter and Condon the name must be considered in estimating the value of the good will.

For the purpose of disentangling the questions of the termination of the contract and the appropriation

of the good will from the allegations of fraud, counsel for the defendant contend that Condon was not guilty of any fraud since the contract did not provide any specific time for duration, and that Condon had the legal right to terminate the contract at will; that even if Condon "did not have the right to continue the operation of the Golf Club, no evidence was offered" that Condon "wrongfully or fraudulently appropriated" the good will.

We are of the opinion that the rule is that "where no fixed term has been agreed upon for the duration of the partnership, any partner may dissolve it at any time by notice of his intention to do so to all the other partners." 30 Cyc., p. 650. This is the rule that is in accord with the decided weight of authority and it is the rule adopted by the Supreme Court of this State. *Blake v. Sweeting,* 121 Ill. 67, 70.

Counsel for the complainant rely on the cases of *Mellersh v. Keen,* 27 Beav. 236, and *Howell v. Harvey,* 5 Ark. 270, which announce a contrary rule to the effect that the termination of a contract of partnership must be made in good faith and not at an unreasonable time. Those cases are exceptions to the general rule.

The case of *Howell v. Harvey, supra,* has been considered in the case of *Freund v. Murray,* 39 Mont. 539, 544, and was held not to state correctly the rule at common law. In the case of *Freund v. Murray, supra,* the court stated the rule correctly as follows (p. 545): "* * * one member of a partnership at will may dissolve the same at any time, reasonable or unreasonable, and in the exercise of either good or bad faith."

It will be observed that the rule as stated by the Supreme Court of this State in the case of *Blake v. Sweeting, supra,* is not qualified by any conditions such as that the termination of the contract must be in good faith and not at an unreasonable time. The

nature of the intent does not determine the right to terminate the contract. If a contract is terminated with an intent to do some act which would constitute fraud, such fraudulent intent would not defeat the right to terminate the contract. The fraud would not relate to the act of terminating the contract, which was a lawful act, but to the subsequent fraudulent act which overtly expresses the fraudulent intent. In the case at bar, however, we do not think that the evidence shows any fraudulent act subsequent to the termination of the contract or any act whatever indicative of a fraudulent intent.

The evidence in the case at bar shows that Condon gave written notice to Salter of his intention to terminate the contract; and there is no evidence that Condon had any fraudulent design in terminating the contract. Furthermore, there is no evidence that Condon fraudulently appropriated the good will of the partnership. Apparently the only facts on which counsel for the complainant predicate fraud are the termination of the contract by Condon and the continuance of the golf business by him under the partnership name of the Harlem Golf Club. These facts in themselves, however, are not fraudulent, and there are no other facts or circumstances which, considered with them, would justify the inference of fraud. It is the rule that "if the motives and designs of the parties charged with fraud * * * may be traced to an honest and legitimate source equally as to a corrupt one, the former explanation ought to be preferred." *McKennan v. Mickelberry*, 242 Ill. 117, 134. The burden rested on the complainant to prove fraud by clear and satisfactory evidence. *McKennan v. Mickelberry, supra.* We are of the opinion that the complainant has failed to make proof of fraud.

With the question of fraud eliminated, the only question to be considered is whether on an accounting there is anything due to the complainant. This ques-

tion involves mainly the value of the good will, if any good will exists.

Counsel for the defendant contend that even if there may be a good will in connection with the partnership, the complainant is not entitled to share in the good will ''because the partnership, if any, was in the profits only.''

The written agreement of September 30, 1909, between Condon and Salter, under which the business was conducted, is as follows:

''This agreement made this 30th day of September, 1909, between John Condon of the City of Chicago, Illinois, party of the first part, and Richard H. Salter, of the village of Oak Park, Illinois, party of the second part, witnesseth:

''First.   Said party of the first part is the owner of a tract of land situated in Cook County, Illinois, known as the grounds of the Harlem Jockey Club, and the tract adjoining the same on the west, and hereby agrees to contribute the use of said tracks of land and the paddock thereon for club house, rent free, to be used as a golf course; the building to be used for locker rooms, etc.   Said party of the first part also agrees to furnish the sum of one thousand dollars in installments, as necessary, to be used in putting the said grounds in condition for use as a golf course, and in remodeling and equipping the paddock to it, suitable for accommodating golf players.

''Second.   Said party of the second part agrees to oversee the expenditure of said sum in putting said grounds in condition and in remodeling said buildings and in equipping the same, and, beginning on April 1, 1910, said party of the second part agrees to devote his entire time and attention to conducting the business of overseeing the said golf course and club house, and shall have entire charge of the same and all employees and general conduct of the business.

''Third.   It is further mutually agreed that the said grounds shall be conducted as a public golf course under the direction of the party of the second part, and that players using the same shall pay for the

privilege of so doing. That, after deducting the running expenses of conducting said business, the net profits shall be divided equally between the parties hereto, and losses, if any, shall also be equally divided.

"Fourth. Said party of the second part agrees that he will keep, or cause to be kept, books of account showing the receipts and disbursements of all funds in the conduct of said business, which books of account shall at all times be open to the inspection of the party of the first part.

"Fifth. It is mutually agreed and understood that should said party of the first part desire to use said grounds for racing meets he shall have the right to do so, and will make suitable arrangements for other club house accommodations."

From the agreement it will be seen that Condon agreed to contribute $1,000 in cash and the use of the land, and that Salter agreed to put the grounds and buildings in condition and personally conduct the business; further, that both were to share equally in the profits and losses. The evidence shows that the business was conducted under the name of the Harlem Golf Club.

The rule is a familiar one that, "As between the parties the question of the existence of partnership relations is one of intention, to be gathered from all the facts and circumstances." *Goacher v. Bates,* 280 Ill. 372, 376. It has been held that: "The fact that parties do business together under a firm name is a circumstance which, although not conclusive by itself, may be considered by a court or jury, in connection with other circumstances, in determining the question whether or not a partnership exists between the parties." *Haug v. Haug,* 193 Ill. 645, 648.

The following rule is well established: "Where the parties agree to share in the profits of a business, the law will infer a partnership between them in the business to which the agreement refers; but this presumption may be disproved. It is prima facie evidence and will control until rebutted." *Lockwood v.*

*Doane,* 107 Ill. 235, 239.

In our opinion there is nothing in the agreement or in the evidence that will rebut the presumption that there was a general partnership between Condon and Salter, unless the fact that Condon, and not the partnership, owned the land should be construed as rebutting the presumption. We do not think, however, that from this fact alone it may be inferred that the parties did not intend to form a general partnership. The nature of the partnership was not dependent upon the ownership of the land. Salter and Condon could have conducted a general partnership in the business of golf on land owned by a third party.

Counsel for the defendant cite authorities to the effect that "a partnership may exist in the profits alone." That is undoubtedly true; but the question whether such a partnership does exist must be determined from the facts and circumstances in evidence.

Counsel for the defendant also refer to authorities which hold that there is a distinction between the terms "profits" and "good will." We recognize that there is a distinction, and that a partnership may exist in the profits of a business and not in the good will, if the intention of the parties is to that effect. Whether the parties in the case at bar so intended is a question to be determined.

The principal case relied on by counsel for the defendant in support of their contention that the partnership in the case at bar was in the profits only, and not in the good will, if any, is the case of *Stevens v. Faucet,* 24 Ill. 483. We do not think that the case is in point. The principal question related to the title to hides which, by the terms of a written contract between the parties, were to be sent by Faucet, Isham & Company to W. H. and F. Stevens to be tanned and manufactured into sole leather by the Stevenses, and the leather from each invoice of hides was to be returned by the Stevenses to Faucet, Isham & Company. The action was one of trover for the

alleged conversion by F. Stevens of the leather. In construing the agreement the court held (p. 485) that according to one paragraph of the agreement, the agreement intended simply to provide "for work and labor of one party to be performed upon the material of the other party for a stipulated compensation." The next paragraph, the court said (p. 486) stipulated that the "profit and loss on all the leather manufactured under the contract should be equally divided between both parties"; and that "Faucet, Isham & Company should charge against the proceeds of the leather when sold, in order to ascertain the gain or loss, which was to be equally divided between the two firms." In considering the two paragraphs together the court said (pp. 486, 487): "This, no doubt, constituted a partnership, but in what, or to what extent, is the question to be determined. Was it the intention of this provision to change the relations which had been established in the preceding part of the agreement? We think it was, to the extent there stated, and no farther. It gave Stevens a right to one-half the profits which Faucet, Isham & Company should realize by the transaction, and obliged them to pay one-half the losses which should be sustained, but gave them no interest in or title to the hides or leather. It was manifestly still the intention of both parties that the title to the property should belong to Faucet, Isham & Company. If such was their intention, the partnership only extended to the proceeds of the leather, and not to the leather itself, or rather, to the profit or loss resulting from the transaction."

From the statement that we have made of the case of *Stevens v. Faucet*, we think that the distinction between that case and the case at bar is apparent. It cannot be fairly contended that in the case of *Stevens v. Faucet*, the court intended to announce as a general rule that in every case where property is owned by one of the parties to a partnership, and the par-

ties are to share equally in partnership profits and losses, the partnership is in the profits only.   The court merely decided that the intention of the parties as manifested by the particular agreement in that case was to share only in "the profit or loss resulting from the transaction." The agreement in that case is materially different from the agreement in the case at bar.   One important difference is that the agreement in the case at bar does not merely provide that Salter shall do work on the land which was to be used for a golf course, the title to which land is not in dispute, but the agreement expressly provides that "the said grounds shall be conducted as a public golf course under the direction" of Salter, and that Salter shall "devote his entire time and attention to conducting the business of overseeing the said golf course and club house, and shall have entire charge of the same and all employees and general conduct of the business." Furthermore, the agreement provides that Condon shall furnish the sum of $1,000 to be used in putting the grounds and buildings in proper condition, and the agreement does not provide that this sum shall be returned.

In our opinion Salter was a general partner with Condon in the business of golf, notwithstanding the fact that Salter was not a partner with Condon in the ownership of the land on which the business of golf was conducted.   It follows, from our view of the nature of the partnership, that Salter was entitled to share in all of the partnership property, including the good will, if any good will existed; and that if Condon has appropriated the good will of the partnership he must account to Salter for the value of the good will as one of the assets of the partnership, if any good will exists.

Counsel for the defendant contend that "even though it should be held that a good will exists in the present case, the complainant is not entitled to share

therein because the good will, if any, attaches to and enhances the value of the defendant's real property and cannot exist or be valued independently of it.''

The definition of the good will of a partnership that has been adopted by the Supreme Court of this State in the case of *Farwell v. Huling,* 132 Ill. 112, 119, is as follows: ''Every possible advantage acquired by a firm in carrying on its business, whether connected with premises or name or other matter.''

It is stated in Corpus Juris that: ''Good will exists as property merely as an incident to other property rights, and is not susceptible of being owned and disposed of separately and apart from the property right to which it is incident.'' 28 Corpus Juris, p. 731.

Corpus Juris also states as follows: ''Good will may be attached to the particular place where the business is conducted. It is not, however, necessarily dependent upon locality, and it may adhere to some other principal thing, such as the reputation acquired by an established business, the tangible assets of a trade, the right to use a particular name, trademark or valuable trade secret.'' 28 Corpus Juris, pp. 731, 732.

It is further stated by Corpus Juris that: ''Good will is a property recognized and protected by law as such, and capable of sale or other transfer from one owner to another in connection with a transfer of the property, business, or other rights to which it is incident.'' 28 Corpus Juris, pp. 730, 731.

In the case of *Metropolitan Nat. Bank v. St. Louis Dispatch Co.,* 149 U. S. 436, the court said (p. 446): ''Undoubtedly, good will is in many cases a valuable thing, although there is difficulty in deciding accurately what is included under the term. It is tangible only as an incident, as connected with a going concern or business having locality or name, and is not susceptible of being disposed of independently.''

It has been stated by Allan that in all questions of good will arising on the dissolution of partnership, "care must be taken to determine whether the good will is of such a character that it can be regarded as an asset at all." As instances in which no good will exists, the following illustrations are given by Allan: "Thus in the case of business in which the custom is due wholly to the personal qualities of those who have carried it on, as in the case of a profession or trade requiring skill, it is not usually an asset. Then again, in the case of trades in which it usually exists as an asset, circumstances may have rendered it valueless, as for example, the insolvency of the firm at the time of dissolution." Allan on Good Will, pp. 57, 58.

In the case of *Hodde v. Hahn*, 283 Mo. 320, in discussing the question of good will the court said (p. 335) that the good will in that case might be "nothing more than a purely imaginary quantity."

In the case of *Farwell v. Huling*, 132 Ill. 112, in considering whether a good will existed in that case, the Supreme Court of this State said (pp. 118, 119): "As to the value of appellee's interest in the good will of the firm business, the clear preponderance of the evidence is that there was, legally speaking, no good will attaching to the business at dissolution. * * * We can discover no more reason, from this evidence, for fixing this item at $5,000 than at $40,000, or any other sum."

It is obvious from the principles announced in the authorities which we have cited in regard to good will, that good will does not always exist. In some cases there may be no good will at all, and in others the value of the good will may be so small as to be negligible. Whether good will exists or not depends upon the facts and circumstances in each case.

In the case at bar no agreement was made between Salter and Condon in respect of the good will.

The precise question in our opinion to be deter-

mined is whether there is a good will which would have a fair marketable value estimated as if the good will was to be disposed of at a judicial sale. The method which we have indicated of determining the good will is in accordance with the rule prescribed in the case of *Hutchins v. Page,* 204 Mass. 284, 290, cited by counsel for the complainant.

It will not be necessary to decide whether the good will "attaches to and enhances the value of the defendant's real property," as counsel for the defendant contend; or whether the good will attaches "to the business of the 'Harlem Golf Club,'" as counsel for the complainant contend. In either event the good will would have no appreciable value to a purchaser at a judicial sale. If the good will should be considered as attaching to the land of Condon, since good will is not susceptible of being owned and disposed of separately and apart from the property right to which it is incident, the good will would not be salable because Condon was under no legal obligation to sell the land, and there is no evidence that he was willing to grant a lease of the land to a purchaser. The evidence in fact negatives the idea that Condon would grant a lease to a purchaser. If the good will should be considered as attaching to the business of the Harlem Golf Club, since by stipulation of the parties the only tangible assets of the business amounted to $300, and since the business would have to be conducted at some other locality than Harlem because Condon could not be compelled to sell the land, and could not be required to give a purchaser a lease to the land, the business of the Harlem Golf Club would have no appreciable value; consequently the good will of the business would be valueless. The name Harlem Golf Club has no salable value apart from the locality with which it is identified. If, for example, the business was conducted at Oak Park or Evanston under the name of the Harlem Golf Club, the name, instead of

being a valuable asset to the business, might be disadvantageous and misleading, since the name Harlem, as shown by the evidence, is identified with the Village of Harlem.

Counsel for the complainant state that even though it should be conceded that Condon was not obliged to sell or lease his land, "he might" have made a lease; that "if he had fixed upon an ample or even a high rental for his land, and offered to lease at that figure to the person buying the good will, there would have been lively bidding at the sale, and that Salter would have been one of the bidders, and that a very substantial sum, no one can say how much, would have been realized."

The argument of counsel for the complainant impliedly recognizes that in order that the good will would have any value to a purchaser, the purchaser would have to obtain a lease of the land from Condon. Since, however, there is no evidence that Condon was willing to grant a lease to a purchaser, and since he was under no legal obligation to grant a lease, the value of the good will should not be estimated on the conjecture that Condon might have granted a lease.

At a judicial sale, what would be considered ordinarily as proper elements of the good will of a partnership in the business of golf? Although the elements of the good will cannot be enumerated with definiteness, they would probably consist of the reputation the business may have acquired, the permanence of the business, the expectancy that the business could be continued substantially as before, the excellent character of the management of the business, the convenient and well-known location of the golf course, the attractive manner in which the golf course was laid out, the expectancy that the old patrons would continue their patronage, the name of the business. All of the elements enumerated would, as a matter of fact, be represented mainly by the name of the business.

In the case at bar the essential elements that ordinarily would compose the good will of the business of golf are lacking. Neither the locality of the golf course, nor the manner in which the golf course was laid out, nor the use of the particular golf course could be considered in determining the good will, since Condon, who owned the land and who by the terms of the agreement contributed only the use of the land to the business, terminated the agreement and resumed exclusive possession of the land. Furthermore, there is no evidence that the business had an established reputation, or that the management of the business was excellent, or that the name of the business had acquired a reputation as a distinctive name in connection with golf.

As we have previously stated, good will is not of itself property, but is only an incident that may attach to or be connected with property, and is not susceptible of being disposed of independently of the other assets of the business.

In the case at bar we have shown that if the value of the good will is determined as if disposed of at a judicial sale, the good will would be valueless to a purchaser if it attached to the land, since Condon owned the land and the land could not be sold by the court; and that the good will would also be valueless to a purchaser if it attached to the business, since there could be no business of any appreciable value apart from the land.

Counsel for the complainant assert that the "expectation of the renewal of a lease by a landlord is a property right and may be one of the constituent elements of good will"; and counsel for the complainant argue that the act of Condon in terminating the agreement, "suddenly ridding himself of his partner, and of the partnership's lease of his land, for the inequitable purpose of thus acquiring the partnership's good will" is no different "in principle between

the case of a partner secretly getting a new lease for himself, for the purpose of continuing the business and thus acquiring the good will of the partnership." Counsel for the complainant cite a number of authorities which hold, in effect, that the law recognizes the renewal of a lease as a reasonable expectancy of the tenants in possession, and that where a partnership is conducted on leased premises, if one partner clandestinely renews the lease in his own name, he holds it in trust for the partnership, to be accounted for as joint property.

The relation between Salter and Condon is not at all analogous to the relation between partners who conduct a partnership on property rented from a third party.

A sufficient answer to the contention of counsel for the complainant is that in our opinion, as previously expressed, Condon did not act clandestinely or fraudulently in terminating the agreement and conducting the business himself, that he had a legal right to terminate the agreement, resume exclusive possession of the land, and conduct the business himself; and that Salter had no right to expect that Condon would continue indefinitely to permit the land to be used for the business of golf. The use of the land was dependent upon the continuance of the partnership agreement, and when the agreement was terminated the right of the partnership to use the land ceased.

Moreover, Salter would not have been justified in having a reasonable expectancy that Condon would allow the land to be used for even a definite period. As the right of the partnership to use the land ceased when the agreement should be terminated, and as the agreement was terminable at will by either party, Salter knew that he had no right to expect that the land might be used after the termination of the agreement. The idea that Salter might have had a reasonable expectancy that the partnership would continue

to use the land, and that such an expectancy is similar to the expectancy of a partner that a partnership lease would be renewed where the partners rent land from a third party, is precluded by the fact that the partnership agreement between Salter and Condon was terminable at will.

That Salter recognized the right of Condon to terminate the agreement at will is shown by letters which Salter wrote to Condon before the agreement was terminated. In one letter Salter speaks of "a statement made that you had been approached by other parties for chance in my place." In the letter Salter also says, "until last week I was sure you would congratulate me upon my success for the season." Again in the letter he says, "It is quite clear to me that some person or persons have been trying to undermine me by painting huge figures in your mind thus trying to induce you to throw me down and give them a chance." It must be presumed that Salter entered into the agreement with full knowledge that it was terminable at will by either party. He could have insisted that a time for the termination of the agreement should be fixed. That he knew that it was advisable to fix a time for the termination of an agreement of the character he entered into with Condon is shown in the letter previously referred to, which he wrote to Condon before the agreement between them was terminated. In the letter Salter proposed a contract to Condon, in which Condon should "turn over for improvement the outfield for nine more holes" for the golf course, and said, "you should consider it but good business for me to ask for a lease for a short period of time, say, five years."

Counsel for the complainant further contend that "so much of enhanced value of real estate as is attributable to good will is to be accounted an asset of the partnership as belonging to the business and not to the property."

There is no evidence that the land in the case at bar has been enhanced in value. The value of the land before the agreement of partnership was entered into is not shown; the value of the land at the time of the termination of the partnership is not shown; the amount of the earnings of the partnership that may have been used to improve the land is not shown; and there is no testimony by any real estate or golf experts as to any enhanced value of the land by reason of the use that was made of the land by the partnership.

Counsel for the defendant maintain, as an independent ground for reversal, that "there is no evidence in this record to justify a finding as to the value of the good will if any existed."

The court found that the good will of the partnership had a value of $33,570.76. The value of the tangible assets of the partnership was $300.

The method by which the court estimated the value of the good will was by taking the amount of the average net profits for the last three years of the partnership and multiplying that amount by the multiple 3. The court found that the total amount of the net profits for the last three years of the partnership was $13,570.76; that the average yearly net profits for the last three years was $4,523.59; that the latter amount multiplied by 3 was $13,570.77, which sum the court found was the value of the good will. The multiple 3, the court said, was the number "suitable and proper when the nature and character of the particular business is considered." The court estimated the net profits from the "book accounts," the "statements of account rendered from time to time by Salter to Condon," and the "final statement of account" rendered by Salter to Condon. These accounts only show the receipts and disbursements of the business.

We are of the opinion that assuming that the good will has a salable value, there is not sufficient evidence

to sustain the finding of the value of the good will by the court.

Corpus Juris states as follows: "No rigid and unvarying rule for the determination of the good will has been laid down by the courts; each case must be determined on its own facts and circumstances." 28 Corpus Juris, p. 735.

In the case at bar it should be borne in mind that in determining whether the good will has any value, the value "is to be estimated as it would have been if disposed of at a judicial sale." *Hutchins v. Page, supra.* It follows that in estimating the net profits of the business in the case at bar as one of the elements which compose the value of the good will, the net profits should not be estimated on the basis as to what the business yielded as net profits to Salter and Condon, but on the basis as to what the business, as customarily conducted, would yield to a purchaser at a judicial sale. In this view, since the use of the land by the terms of the agreement of partnership between Salter and Condon was contributed by Condon "rent free," and since, if the business was conducted in the customary manner, rent would have to be paid for the use of the land, therefore in estimating the net profits the fair market value of the rent for the use of the land would have to be considered. The court, however, did not take such rent into consideration in estimating the net profits. Furthermore, on the same principle that we have indicated in regard to the question of rent, since no salary was paid to Salter for his services, a reasonable allowance for his salary should be considered in estimating the net profits (*In re Ulrici's Estate,* 111 N. Y. Misc. 55, 182 N. Y. Supp. 516, 520); and interest on the capital invested should also be considered in estimating the net profits. *In re Ulrici's Estate, supra; In re Demarest's Estate,* 157 N. Y. Supp. 653, 655. The court did not consider either of these items in estimating the net profits.

Counsel for the complainant contend that Salter and Condon have indicated "by their express contract and by the practical construction given to that contract throughout the five years of the partnership by the partners," that no rent, salary or interest should be allowed in estimating the net profits. In the view we have previously expressed, it is immaterial what the agreement was between Salter and Condon in respect to these items. The net profits should not be estimated as to their value to Salter and Condon, but from the aspect of a purchaser at a judicial sale.

In considering further the estimate of the net profits made by the court, it appears that in multiplying the average net profits of the partnership for the last three years by the multiple 3 in order to determine the good will of the partnership, the court arbitrarily selected 3 as the multiple without sufficient evidence to justify the selection. The rule which the court was attempting to follow in estimating the good will provides that "the valuation of good will may be fairly arrived at by multiplying the average net profits for a period of years by a number of years, such number of years being suitable and proper, having reference to the nature and character of the particular business under consideration." 28 Corpus Juris, p. 736. This rule for determining the value of good will has been adopted in some cases. 28 Corpus Juris, p. 736. As we understand the position of counsel for the defendant in regard to the rule, it is this: They do not concede that the rule is a correct method for determining the value of good will, but maintain that even if the rule should be assumed to be the proper method, the court did not correctly apply the rule. We agree with counsel for the defendant in their contention that the court did not correctly apply the rule. In selecting 3 as the multiple, the court, it is true, found

that 3 was the number of years "suitable and proper when the nature and character of the particular business is considered." But there is not adequate evidence to support the finding that the multiple 3 was suitable and proper. It is the rule that "the proper number of years is not a question of law but one of fact." 28 Corpus Juris, p. 736. The number by which the average annual profits should be multiplied "is dependent upon the nature of the business, the length of time during which it has been conducted under the particular name, the extent to which it has become known to the public through advertising or otherwise, how much of its success may be attributed to the personality of" the management or proprietors "and other considerations of a like character." *In re Demarest's Estate, supra.*

The evidence in the case at bar shows that the net profits estimated as between the parties themselves increased each year during the five years of the business; that the first year the net profits were $949.76, and that the last year the net profits were $6,087.64. The evidence does not show, however, whether the profits were of amounts such as might have been fairly and reasonably expected. There is no evidence on which a comparison of profits could be made with other golf clubs similarly conducted. There is no evidence as to whether the business was efficiently conducted. There is no evidence as to whether the amount of the patronage of the club reached fair and reasonable expectations. There is no evidence that the name Harlem Golf Club had acquired a reputation among golf players, or that the name Harlem had become identified with the business of golf conducted by the partnership between Salter and Condon. There is no evidence that the locality of the golf club was convenient and accessible.

On the evidence in the case at bar we can see no more reason for selecting the multiple 3 than any other multiple.

In considering the method adopted by the court in estimating the value of the good will we have assumed, for the sake of argument, that the partnership had a good will, the value of which is susceptible of being estimated.  We have previously held, however, that the partnership had no good will that was of a salable character.

Counsel for the complainant have assigned as a cross error that the court erred in not allowing interest on the amount found due to the complainant.  The theory of counsel for the complainant is that interest should be allowed because "Condon wrongfully took and wrongfully detained the whole assets of the partnership and refused to account to Salter for the value of the assets."

In the view we have taken of the case, the question of interest has become an immaterial one.  We are of the opinion, however, that interest should not be allowed.  In order to justify a recovery of interest the delay of payment must be both unreasonable and vexatious; and we do not think that there was any unreasonable and vexatious delay.  *Maynard v. Richards,* 166 Ill. 466.

The total amount, $6,902.55, which the court decreed should be paid to the complainant, which amount included the value of the good will, was arrived at as follows:

"The court therefore finds that there is due from the defendant to the complainant one-half of the value of the personal property of said copartnership appropriated by him at the time of the dissolution of said copartnership as hereinbefore found ...............................$  150.00
and one-half of the value of said good will as above found, which is the sum of.  6,785.38

Total due from defendant to complainant  ................................$6,935.38

Less sum not accounted for to defend-
ant ................................. 32.83

                                    $6,902.55.''

For the reasons stated the decree is reversed as to
the finding of the court that $6,785.38 is due to the
complainant as the complainant's share of the good
will; and the decree is affirmed as to the balance of the
amount which the court found to be due to the com-
plainant, namely $117.17. The cause is remanded with
directions to the court to enter a decree in favor of
the complainant for $117.17, and for such other pro-
ceedings as may not be inconsistent with this opinion.
*Affirmed in part; reversed in part, and remanded with
directions.*

McSURELY, P. J., and MATCHETT, J., concur.